And we move to the second case this morning. Quinn Health v. Indianapolis Fire Department Kathleen Delaney On the very same day that the Indianapolis Fire Department instructed several employees to appear for interviews with government investigators in Rodney's False Claims Act case, Chief Malone blacklisted Quinn Heath and violated merit law by making too many discretionary picks to pass over Quinn Heath on the ranked hiring list. The district court improperly excluded prospective employees like Quinn Heath from protection against blacklisting when interpreting the False Claims Act anti-retaliation provision. By adding a temporal limit to the ambiguous term employee, the court aired warranting reversal. First, employee is an ambiguous term in the False Claims Act. The statute does not define employee, but the U.S. Supreme Court in the Robinson case held the term employee to be ambiguous in the Title VII context. And there are many cases that say that Title VII is the gold standard when interpreting employment discrimination statutes. The district court appears to assume that employee is ambiguous by resorting to the dictionary and deciding that prospective employees were excluded from coverage. Do you think we can just take as gospel that statement about the gold standard? I mean, these are very different statutes, aren't they? Well, they're both statutes that govern the employment relationship, and they hinge upon the definition. They're actually a closer analogy, aren't they? The closest analogy would be the Sarbanes-Oxley Act, and that language aligns almost identically with the False Claims Act. And we do have Sarbanes-Oxley case law saying that prospective employees are covered in that act. Why do you think Sarbanes-Oxley is the closest analogy? Because of the language. If you line up and compare the statutory language, they line up. And there are cases that have already held that that's the case. In particular, Halliburton v. Department of Labor, which is a Fifth Circuit case from 2014, says that the Sarbanes-Oxley Act is comparable to the False Claims Act on the anti-retaliation language, specifically referring to the provision which says that all relief necessary to make them whole appears in both statutes. Why do you suppose Congress didn't make it a little clearer and tell us that employee includes future employees? Well, that would have been easy, wouldn't it? That happens all the time, obviously. Well, it also happens where we rule and say, look, employee means employee. Employee doesn't mean somebody you're going to be an employee. And then Congress will go back and change it. Well, in this context, Your Honors, some amendments to the False Claims Act make it clear that the purpose of the statute is to encourage and protect whistleblowing. And the Senate report that we cited in our brief makes clear that amendments were designed to broaden coverage for whistleblowers to make it all-inclusive. And the report specifically says that temporary, blacklisted, or discharged workers should be considered employees for purposes of this act. And we know from this court's decision in AutoNation v. National Labor Relations Board that blacklisting implies discrimination against a job applicant. So where the Senate report talks about blacklisting, we know blacklisting connotes a hiring decision. That, combined with this court's decision in Fanslow, where there's a precedent for giving broad interpretation to the False Claims Act, along with other case law from this court, including George v. Junior Achievement and Flowers v. Columbia College, where the court has held that when dealing with ambiguous anti-retaliation provisions, the courts are supposed to resolve those ambiguities in favor of the employees, not the employer, which is what happened here. So when we look at analogous statutes, when we look at the Robinson decision, we believe that the only reading that makes sense is for employee to cover all kinds of employees— which was the case in the HACA decision from Wisconsin. The court here, instead of giving a broad interpretation to the word employee, imposed a temporal limit when one does not appear in the statutory language. The district court essentially added the word current before employee. But many cases, starting with Robinson, have found that employee includes former employees. And in fact, the district court's decision in this case seemingly acknowledges that former employees are protected. There is no principled basis to extend anti-retaliation protection to current employees and former employees, and former employees seeking rehire, but not to prospective employees. Employers can retaliate and discourage reporting of false claims from all types of employees, and excluding prospective employees from coverage incentivizes employers to weed out people just like Quinn Heath. By not hiring them in the first place, they avoid false claims down the road. Isn't this just an extraordinary coincidence, though? It seems to be highly unlikely that Congress would have been anticipating we need to worry about employee applicants who are almost never going to be in a position to provide support for the False Claims Act claims, and just by coincidence are associated with somebody who did here. Well, in a typical case, what would happen, or the more common scenario would be someone makes a false claim against an employer and they get fired for it, and then they're looking for their next job. Right. And the second employer declines to hire them because they have historically made a false claim. That would be the more common scenario. In that situation, would the former employee have a claim against the first employer, the second, or both? Well, if the first employer gave a negative reference, then it would be both. If the first employer wasn't involved in the subsequent hiring decision, then it would be only the second. But in the 2009 amendments to the statute, Congress specifically noted that the associated other protections are designed to include to deter and penalize indirect retaliation by, for example, firing a spouse or a child of the person who blew the whistle. So children are clearly associated others. And in this context, it's even more on point because the Indianapolis Fire Department encourages legacy hires. In the discretionary selections that the chief has available to him, he gives credit to legacy candidates, meaning the son or daughter of an existing firefighter. So here, what better way to retaliate against Rodney Heath, who the deputy chief referred to as a, quote, And he went 13 people below in the rank order in order to hire people other than Quinn Heath. And when you look at the timeline here, in the morning at about 11 a.m. on September 16th, the deputy chief, the same person who referred to Rodney Heath as a shit-stirrer, sends out an email telling several firefighters that they need to go be interviewed by the Department of Homeland Security in the false claims investigation, copying Chief Malone on that email, the chief of the department. Less than three hours later, Quinn Heath gets an email saying he's not been hired, even though he was ranked well and the human resources manager told Rodney Heath months earlier that his son was a, quote, shoe-in for the next class. On those points, everybody who was on the list below Heath was a discretionary hire, right? Who got hired? Thirteen of them, yes. And they all had two of the so-called markers? Yeah, they each had a checkmark, two checkmarks by their name, and Quinn had only one, and Chief Malone is the one who decided who got what checkmarks. Right, but is there any, I mean, there's a serious causation problem here. Well, he over-selected discretionary picks. Merit law sets a rule at 80-20. He was only allowed seven discretionary picks, and he used 13, and so Mr. Reducing the rank. Right, so he went all the way down to rank number 161 to fill that class, using more discretionary selections than the statute allowed him to use. Under your theory, could, is there any way that Quinn Heath would have been hired on the automatic qualification? Yes. How? Because the chief was only allowed to select seven discretionary picks. Instead, he selected 13, and several of the discretionary picks were ranked higher than Quinn on the list. And the reason is because there were two lists. One list had Quinn at number 82. Another had him at 78. This may be where the counting gets confusing. Why were there two lists? Because the human resources manager is the keeper of the list and responsible for updating it. She printed it out, handed it to Chief Malone, and then he marked it up and made his notes on it. So on summary judgment, the court should have used number 78, construing the facts in our favor. Instead, she used number 82. And Chief Malone, at his deposition, literally made a math error on the record trying to tell me how he got where he got in his picks. Unless you have any further follow-ups, I'd like to reserve the balance of my time. All right. Thank you. Judge Hamilton. Okay. Go ahead. Mr. Morgan. Thank you, Judge Kaney, and may it please the Court. There are two possible ways to decide this appeal, either by deciding the statutory interpretation question that the district court decided or by deciding the causation question. The district court's judgment should be affirmed under either approach, but I would submit that the causation issue provides the most straightforward way to resolve the appeal because that issue turns on indisputable evidence and simple, objective math. On that causation question, reading from Quinn Heath's own appellant's brief, Heath's ranking was 64, 65, 78, or 82. That's at page 30. We explain in our brief why accepting, giving him the benefit of the doubt, and taking that best possible ranking of 64, it was mathematically impossible for Quinn to be an automatic selection in either the first class or the second class. Now, in reply, and again here today at argument, Quinn's now suggesting that perhaps, and I think this is the first time he's made this suggestion, that perhaps his ranking was actually even better than 64 because if you peg the math to this list where he was initially ranked 78 instead of the list where he was ranked 82, he would be four spots higher. There are two critical problems with that, and I think it's important to make sure the record is clear. The first is that the math still doesn't work. Moving him up four additional spots could not have gotten him into the first class where he was at least 40 spots too low. And moving him up four additional spots couldn't have gotten him into the second class where he was at least five spots too low. The second problem with Quinn's reliance on the list where he's ranked 78th is that the record shows it's not the final list from which hiring decisions were made. That list is in the record at page 570. And if you look at that list, you'll see in column seven there are scores ranked. Those are the performance scores based on performance pieces of the application process, things like a written exam. And based on those performance scores only, Quinn Heath is ranked 78th with a score of 84.7. But what Quinn doesn't talk about when he talks about this list is undisputed testimony in the record at pages 365 to 367 and the merit law, which makes clear that there are additional factors in addition to performance that can get candidates bonus points under the merit law. There are four characteristics that you are required to give points for under the merit law. This is separate and apart from the five discretionary markers. These are merit law-required things like being the child of a police officer or a firefighter who died in the line of duty, being an active duty military veteran, things of that nature. Quinn didn't get any points for those, but if you look at the list at page 570, four applicants who rank below him did. Those applicants are Daniel Barker, Aaron Spicer, Isaac Warren, and Miguel Hongay. And when you look in the next column over from the performance score, you'll see their combined score then increases, and it's higher than 84.7. And that's why on the final list from which Chief Malone made hiring decisions, the list in the supplemental appendix, those four candidates are moved ahead of Quinn in Quinn's ranking. And all the markers, I assume those would be called a marker? Those are separate and apart from the markers. The markers are department policy for the discretionary, the 20% discretionary selection. These are merit law-required preferences that actually get factored into the scores to make the ranking list. Merit law, Indiana statute, or ordinance from? In this case, there is a model merit law under Indiana law. In this case, Indianapolis has its own ordinance. How about the markers? What is the basis of the markers? Is it regulation, statute? This is a department policy. The undisputed evidence in the record is that this has been department policy for at least several years. I actually think this dates back, my understanding is it dates back to a decades-old consent decree that involved the department. I see. Well, it's not a new fire department to include legacies. No, not at all. And it's undisputed that those are, in fact, the department's, that it is, in fact, the department's policy to preference candidates in the discretionary process who have at least two markers, and Quinn didn't have two markers. He might have a causation argument. Had the department exhausted those two-marker candidates and then gotten to one-marker candidates like Quinn, who was a legacy, and then still passed him over. The problem is the department filled both classes, and I think there were over a dozen two-marker candidates remaining. There's no argument that he only was entitled to one marker. Correct. He has suggested not in argument, but in his factual statement, he points out that he didn't get marker credit for a college degree despite having 66 hours of college credit. He had the hours but not the degree. Correct. He had no college. Or somebody else had a degree, an associate degree, but he didn't have a degree. Right. And it's not hard to imagine why an employer might prefer a candidate who completed a program and earned a degree, but whether or not that's a wise policy is beside the point. It's undisputed that the department does, in fact, follow that policy, and there are other candidates on the list who had some college who don't get credit for a college degree. So turning from the causation question to the statutory question, the city isn't asking the court to add any language to Section 37-38, and it's not asking the court to read a single word in that statute in a manner that's inconsistent with any English language definition. We're simply asking to read employee, contractor, or agent to mean what they say. When Congress added anti-retaliation protections to the False Claims Act, it had two considerations in mind, two competing considerations. On the one hand, Congress definitely was intending to protect whistleblowers and to encourage folks to report information to the government. On the other hand, both Congress and the Department of Justice were concerned that an expanded False Claims Act would both invite and prolong meritless litigation. And as this court explained in some detail in the Neal against Honeywell case, Congress didn't completely abandon one of those competing concerns in favor of the other. Section 37-30H is a compromise between them. So what do you think about former employees? As to whether the word employee is ambiguous as to former employees, I think that's a much closer question, thinking about the Robinson analysis. Because the question there, both current and former employees, I think fall within any accepted definition of the word employee. The question is simply what timeline Congress was talking about. Job applicants are different in kind. They've never been employees. They've never had those bundle of rights that attach to being employees. And I don't think it's... In your view, Mr. Morgan, do you think the district court in the HACA case was incorrect, or do you think that is simply distinguishable, or both? I think both. Well, I think it doesn't matter for purposes of this case. Although if, in fact, in a different case, the court were facing the question as to whether this word employee in this context is ambiguous as to former employees, I don't necessarily think the HACA decision is incorrect, finding that a former employee who engaged in protected conduct while he was employed is then protected from post-employment retaliation. So what about the scenario that plaintiff's counsel identified? Plaintiff engages in protected conduct with employer A, then leaves for one reason or another, seeks employment with employer B. Employer A gives a bad referral motivated by retaliatory intent. Does that person have a claim against one or both or neither? Certainly not against the employer with whom his only relationship was being a job applicant under this statute. He doesn't have a claim against that employer. Even though that employer is acting with, in essence, complementing the retaliatory intent. Right, because Congress, again, these are the difficult policy choices Congress has to make when it's weighing competing considerations, where to draw the line. And what Neil talks about is Section 37H tells us how far Congress was willing to go in protecting whistleblowers. And what Congress says is employees, contractors, and agents. It says nothing about job applicants, blacklisted workers. It says nothing about discrimination in regard to hire, like, for instance, the NLRB does. Well, what you just described, though, would provide a claim against the former employer for blacklisting its employee, but not for somebody who reads and heeds the blacklist, right? I think in this situation that might be the effect. That's what you're describing? I think that could be the effect, yes. And, again, it comes back to these balancing concerns Congress had. I don't think it's surprising that Congress chose to draw the line at employees because, as the Tenth Circuit said in the McBride case, it is employees who are uniquely suited both to discover and root out fraud. That's just not the case with job applicants. So when Congress is trying to decide what the balance is, again, it's concerned about meritless litigation. It's also concerned about protecting whistleblowers. That balance is different with respect to employees who are in that unique position or for others in employment-like relationships, contractors, and agents, than it is for job applicants. And to Judge Hamilton's point during Ms. Delaney's presentation, certainly there could be some idiosyncratic instances where you would have an applicant who might have some unique knowledge, but I think Congress made the decision that it wasn't willing to sort of elevate that interest at the expense of the other when you might have a few marginal cases that get covered, as opposed to employees who, as a general matter, are going to be uniquely suited to root out fraud. Could I have your comment on Ms. Delaney's analogy to the Farbins-Oxley Act? Candidly, the language is similar in some ways. The United States Supreme Court talks about the prohibited forms of discrimination being similar in the Lawson case. If anything, though, I think that actually cuts in our favor. It talks about those sorts of prohibited forms of discrimination being commonly understood as forms of discrimination one would engage in against its own employees. So, you know, I think the Court can look to parallel statutory schemes. Of course, we cite quite a few where, you know, when Congress intended to protect job applicants, it explicitly said so. That's the case in Title VII as well, the statute. The Robinson case talks about it. We know Robinson wasn't talking about job applicants when it said the word employee is ambiguous because Title VII explicitly protects job applicants. And Robinson makes very clear that a job applicant is not just a temporally distinct class of employee. It's something different. And that really takes me to the big sort of practical big picture problem, I think, with Quinn's argument. To accept Quinn's reading, we would have to believe that a Congress bent on protecting job applicants decided that the way to do that was to pass a statute that says nothing about job applicants, nothing about blacklisted workers, that provides remedies that are most naturally read as applying to current or former employees but not job applicants, and that doesn't prohibit discrimination in regard to hire like Congress has in other statutes, and that instead Congress decided the best way to protect job applicants was with an ambiguous reference to blacklisted workers in one line of a 30- or 40-page Senate committee report. There is no reference to that or to job applicants anywhere else in the legislative record, nowhere in the floor debates, nowhere in the sponsor statements. I would submit to the Court that Congress does not speak in such coded language and that the better way to think about this is that if Congress, in fact, intended to protect job applicants, it would have done what it has done in scores of other anti-retaliation provisions. It would have protected both employees on one hand and job applicants on the other explicitly in the language of the statute. If there are no other questions at this time, I will waive my balance. Thank you, Counselor. Thank you. First, I'd like to point out that Rodney Heath's claim was not meritless. In fact, it survived summary judgment and then the Fire Department settled the case, paying significant dollars to settle that False Claims Act case. So we're not here about a meritless case. Second, causation was not decided by the District Court. It is the District Court's function to weigh facts and determine whether there's a genuine issue for trial, and that has not been done yet on the causation element of Quinn's claim. We believe there are genuine issues of material fact about which list should have been used, about why the Chief can violate merit law and over-select discretionary picks, about why that same Chief used his own discretion to decide that Quinn got only one checkmark instead of two, even though he had 66 hours of college credit under his belt, while several other candidates got a checkmark for having only 60 hours of college credit under their belt. And there's nothing in the regulations that specify that an associate's degree for 60 credit hours is worth more than 66 hours. Well, let's talk about degrees. Does it say degrees or does it say hours? It doesn't say anywhere. This is simply the Chief's discretion as to who he literally hand-wrote a checkmark next to people's names. So there's no... The merit law simply says 80-20. Eighty percent of the class gets picked through the hard numbers, 20 percent through the discretion. Where the problem comes in is the Chief gets to decide who gets the checkmarks to get to the two checkmarks for favored treatment. But there's a standard use of college... They consider education, prior experience in firefighting, legacy, minority, and female status. Those are the factors that are considered. And also there's a genuine issue of material fact about whether Quinn should have been an automatic selection for the second class and that they passed over him by over-selecting on the discretionary side. So this court should not decide this case on causation because it wasn't decided below. In terms of the coverage of former employees and not prospective employees, there's no principled basis to distinguish between those two categories of people for purposes of protection against retaliation. And the Sarbanes-Oxley Act, the language lines up on all fours with our statute, and the Department of Labor has issued regulations under Sarbanes-Oxley which specifically state that it covers prospective employees. So the Sarbanes-Oxley Act does provide us with a roadmap for the same kind of statutory interpretation that we're arguing for here. And if you look at the statute, the False Claims Act prohibits, first of all, provides. Well, it gets down to part of the problem, basically, is should we be doing this or should Congress do it? Well, the statute uses the most broad language you possibly could when it says that employees are entitled to all relief necessary to make that employee whole. But the fact is that your client never was an employee. Right. He was nine months in a hiring process where he took all kinds of tests and got all kinds of scores and passed an interview and was ranked ahead of 13 people who got selected whose fathers weren't relators. This very same issue has not been decided yet by a circuit court of appeals, but the Tenth Circuit has oral arguments set in the Potts case on March 22nd of this year, and it presents a very similar issue about the interpretation of whether the False Claims Act prohibits. You say the Fifth Circuit? Tenth. Tenth. Yes. So we would urge that the court reverse the district court's decision and remand for further proceedings so that Mr. Heath can hopefully get his job as a firefighter, which he's been working towards for years. Thank you. Thank you, counsel. Thanks to both counsel, and the case is taken under advisement.